IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore

Civil Action No. 23-cv-00313-RM-KLM

FOX FACTORY, INC.,

    Plaintiff

v.

SRAM, LLC,

    Defendant.

## ORDER

This matter is before the Court on the Motion of Plaintiff FOX Factory, Inc ("FOX" or "Plaintiff") for Preliminary Injunction ("Motion") (ECF No. 73) requesting this Court to prohibit Defendant SRAM, LLC ("SRAM" or "Defendant") from (1) making, using, selling, or offering for sale within the United States, or importing into the United States, the Accused Forks[1] and products not more than colorably different from them; and (2) inducing other persons to make, use, sell, or offer for sale within the United States, or import into the United States, the Accused Forks and products not more than colorably different from them.  (ECF No. 73, p.19.) SRAM filed a response in opposition and FOX filed a reply.  The Parties appeared for an evidentiary hearing before the Court on May 26, 2023 and June 1, 2023.  The Motion is now ripe for resolution.  Upon consideration of the Motion and the court record, and being otherwise fully advised, the Court finds and orders as follows.

---

[1] FOX defines the "Accused Forks" as "the base, Select, Select+, Ultimate, and Ultimate Flight Attendant models of the Lyrik, Pike, and ZEB series of SRAM's RockShox forks."  The Court will use the same terminology.

I.  BACKGROUND

This is an action for patent infringement. Specifically, FOX brings two claims. The first is a claim alleging that SRAM directly infringed, contributed to direct infringement, and induced infringement of FOX's patent no. 9,739,331 (the "'331 patent") under 35 U.S.C. §§ 271(a)-(c). (ECF No. 29.) The second alleges that SRAM directly infringed, contributed to direct infringement, and induced infringement of FOX's patent no. 8,850,223 (the "'223 patent") under 35 U.S.C. §§ 271(a)-(c). (Id.) The patents at issue relate to shock absorbers and racing suspension products for mountain bikes. (Id.) FOX seeks a preliminary injunction only as to the technology involved in the '331 patent. (ECF No. 73.)

The '331 patent is for an "air bleed assembly disposed on the lower fork tube." (ECF No. 1-1.) It is a device that allows riders to improve the shock absorption on their bikes when they are changing elevations or temperatures. (Id.) A change in altitude or temperature, which results in a change in air pressure, can degrade the performance of the suspension fork. (ECF No. 71.) The air bleed assembly allows a rider to manually equalize the air pressure inside and outside the suspension fork, thus improving its performance. (Id.)

The location of the air bleed system is also important to the claims here—FOX asserts that its patent is unique because it locates the air bleed system in a spot that allows the oil in the fork to remain level, without spraying or leaking out. (ECF No. 71.) The Parties disagree about the extent to which the patent (and the arguments made during its prosecution) restricts the location of the air bleed assembly—both agree that it must be in the lower fork tube, between the lower leg seal and above a resting level of the oil bath lubrication in that lower fork. (ECF Nos. 71, 82.) SRAM, however, argues that the FOX patent further restricts the location, and that the patented air bleed assembly must be located between the lower leg seal and the upper bushing.

2

(ECF No. 82.)  FOX disagrees.  (ECF No. 89.)  SRAM asserts that its Accused Forks, which FOX is alleging violate the '331 patent, were expressly designed around the specifications of that patent and that the SRAM air bleed valves are not located in that narrower area.  (ECF No. 82.)

In any event, SRAM makes similar product, the Accused Forks, and sells them to distributors, retailers, resellers, customers, and end users.  (ECF No. 29.)  SRAM also sells upgrade kits that FOX argues convert non-infringing forks into infringing forks when used together.  (Id.)  FOX alleges that these sales violate its patent.  (Id.)

## II.     LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Free the Nipple-Fort Collins v. City of Fort Collins*, *Colorado*, 916 F.3d 792, 797 (10th Cir. 2019) (quotation marks and citation omitted).  Before such relief may be had, FOX must establish: "'(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) that the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) that the injunction, if issued, will not adversely affect the public interest.'" *Diné Citizens Against Ruining our Environment v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016) (quoting *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002)). "Because [the] plaintiff bears the burden of proof under the preliminary injunction standard, the failure to aver sufficient detail in the factual allegations precludes the issuance of a preliminary injunction."  *Soesbe v. Countrywide Home Loans*, No. 09-CV-01961-PAB-KMT, 2009 WL 3418212, at *3 (D. Colo. Oct. 20, 2009).

> Because a showing of probable irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction," the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.  Irreparable harm must be shown by the moving party to be imminent, not remote or speculative and the alleged injury must be one incapable of being fully remedied by monetary damages.

*Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990) (quoting *Bell & Howell: Mamiya Co. v. Masel Co. Corp.*, 719 F.2d 42, 45 (2d Cir.1983), remaining citations omitted).

### III.  DISCUSSION

FOX contends that it meets the standards for granting their requested relief.  The Court examines the record to see if it is so.  The Court concludes that its inquiry can begin, and end, with the question of irreparable injury which, the Court finds, has not been demonstrated in this case.

### A.  Irreparable Injury

"The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance." *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018) (quotation marks and citation omitted).  "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Heideman v. S. Salt Lake City*, 348 F.3d at 1182, 1189 (10th Cir. 2003) (quotation marks and citation omitted).  "[L]ost market share must be proven (or at least substantiated with some evidence) in order for it to support entry of a preliminary injunction, because granting preliminary injunctions on the basis of speculative loss of market share would result in granting preliminary injunctions 'in every patent case where the patentee practices the invention.'" *Automated Merchandising Sys., Inc. v. Crane Co.*, 357 Fed.Appx. 297, 301 (Fed. Cir. 2009) (quoting *Nutrition 21 v. United States*, 930 F.2d 867, 871 (Fed. Cir. 1991)).

"It is also well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm; such losses are compensable by monetary damages." *Id.*  Thus, the moving party "must demonstrate a significant risk that he … will experience harm that cannot be

4

compensated after the fact by money damages." *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d at 1136, 1141 (10th Cir. 2017) (quotation marks and citation omitted).  Furthermore, to the extent that the request for a preliminary injunction rests on a concern that the patentor will be forced to lower prices absent such relief, evidence that such price reduction would force the patent-holder out of the market entirely could suffice.  *Automated Merchandising Sys., Inc.*, 357 Fed.Appx. at 301.  On the other hand, "[s]imply because a patentee manages to maintain a profit in the face of infringing competition does not automatically rebut a case for irreparable injury.  Irreparable injury encompasses different types of losses that are often difficult to quantify, including lost sales and erosion in reputation and brand distinction." *Douglas Dynamics, LLC v. Buyers Products, Co.*, 7171 F.3d 1336, 1344 (Fed. Cir. 2013).

      A patent-holder may also be able to show a risk of irreparable harm by demonstrating that its product competes in a "design wins" market, where original equipment manufacturers ("OEMs") determine which company will provide a particular component for a generation of a particular finished product.  *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1336 (Fed. Cir. 2013).  In such a market, it may be possible for a party to show that once a particular component is chosen, the OEM is effectively locked into using that winner's product.  *Id.*  In order to successfully make such a showing, however, it is nevertheless necessary to demonstrate that the infringement itself caused the harm.  *Id.* at 1337.

> Sales lost to an infringing product cannot irreparably harm a patentee if consumers buy that product for reasons other than the patented feature.  If the patented feature does not drive the demand for the product, sales would be lost even if the offending feature were absent from the accused product.  Thus, a likelihood of irreparable harm cannot be shown if sales would be lost regardless of the infringing conduct.

*Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012).  While this does not require the patent-holder to demonstrate that the patented feature was the only but-for-cause of the lost sales, it must prove that the feature drove demand for the product.

In this case, FOX has presented theoretical harm that its executives fear that it could suffer.  In the Court's view, however, it did not present sufficient evidence that it will suffer irreparable harm absent the imposition of a preliminary injunction.

FOX's primary source of evidence for its contention that it risks irreparable harm was the testimony, both written and at the evidentiary hearing, of its executive vice president of the cycling division, Wesley Allinger.  Mr. Allinger testified based on his lengthy history working in the field as well as his experiences as an avid cyclist.  Much of Mr. Allinger's testimony, however, was speculative or anecdotal.  He testified that FOX and SRAM compete in a sort of "design wins" market, and that the company that wins a particular "spec" position gains a certain degree of incumbency advantage, which he referred to as the "stickiness" of spec wins.  Mr. Allinger explained that a previous spec win renders the position the winner's to lose.  He also noted that since the time that SRAM has allegedly been infringing the FOX patent, FOX has lost a number of spec positions to SRAM.  FOX did not deny, however, SRAM's assertion that FOX had already reclaimed at least one of those positions and that it had done so with a fork that lacked the disputed air release valves.

Mr. Allinger also testified that he "expects" SRAM's alleged infringement to have several impacts on FOX, including that he expects FOX will experience downward pricing pressure and expects that FOX's reputation for innovation will be adversely impacted by the SRAM infringement.  Mr. Allinger conceded, however, that a number of different factors go into pricing decisions, and he could not specify or even estimate the impact SRAM's use of bleeder

6

valves would have. He also conceded that FOX continues to have an excellent reputation for innovation.

Mr. Allinger also offered his opinion, based on admittedly anecdotal evidence, that the SRAM's bleeder valves are popular—he has observed the SRAM forks in use in bike parks and has spoken with other riders. He has also read product reviews in trade magazines. He offered his personal opinion that the bleeder valves are one of the most important features in bicycle forks.

In addition to Mr. Allinger's testimony, FOX offered into evidence articles from some of those trade magazines which discussed the popularity of the air bleeder valves. FOX also introduced an interview conducted by Vital MTB in which the interviewer asked an SRAM executive why they had not yet incorporated air bleeder valves into their forks. The SRAM executive responded that they had not done so because of intellectual property concerns which, FOX contends, suggests that SRAM wished to include the feature and recognized its desirability. Finally, FOX offered SRAM's marketing materials which included the air bleeder valves as one of the features they were touting.

The Court concludes that FOX has failed to demonstrate that it is likely to suffer irreparable harm that could not be compensated monetarily following a trial. The evidence presented was either speculative or anecdotal and, moreover, some of it was directly contradicted by the evidence presented by SRAM. While FOX is understandably concerned about lost profits, it did not demonstrate that any such injury would "be both certain and great," and not "merely serious or substantial." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (quoting *A.O. Smith Corp. v. FTC*, 530 F.2d 515, 525 (3d Cir.1976)). Mr. Allinger was clear that, although an important part of the company, cycling was one of several

7

successful product divisions at FOX. As such, FOX presented no evidence that lost sales for that department would represent a "great" injury to the company as a whole. Furthermore, while Mr. Allinger expressed his concern that FOX's reputation for innovation would be damaged by SRAM's sale of the allegedly infringing forks, he also conceded that despite those ongoing sales FOX continues to have an excellent reputation for innovation. The other evidence presented demonstrates that the air bleed valves are a desirable feature on a bicycle suspension but fails to demonstrate that they drive either sales or pricing, or if they do, to what extent. Absent even any assertions on those questions FOX's evidence again fails to demonstrate the likelihood of irreparable harm.

Accordingly, FOX has failed to demonstrate that it will suffer irreparable harm if a preliminary injunction is not issued. Having so concluded, the Court need not address the remaining factors for the granting of an injunction. *Reuters Ltd.*, 903 F.2d at 907.

## IV. CONCLUSION

Based on the foregoing, it is **ORDERED** that FOX's Motion for Preliminary Injunction (ECF No. 73) is DENIED;

DATED this 17th day of July, 2023.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge