IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Gordon P. Gallagher

Civil Action No. 23-cv-00313-GPG-KAS

FOX FACTORY, INC.,

    Plaintiff,

v.

SRAM, LLC,

    Defendant.

## CLAIM CONSTRUCTION ORDER

This matter is before the Court for claim construction consistent with *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).

## I. BACKGROUND

This is a patent case wherein, after some procedural wrangling, Plaintiff Fox Factory, Inc. (Fox Factory) asserts U.S. Patent No. 9,739,331 (the '331 Patent). The Court thanks the Parties for narrowing the disputes, leaving only a few terms for construction (*see* D. 224; D. 225). The accused products are shock absorbers and related conversion kits sold by Defendant SRAM, LLC (SRAM) (D. 29).

The '331 Patent is entitled "Method and Apparatus for an Adjustable Damper" and issued on August 22, 2017 ('331 Patent at front page). Figures 3 and 4 are shown below:



In most relevant part, the '331 Patent describes the invention as:

> The presently disclosed system allows a rider to push a button and let the pressure in the lower leg equalize to ambient pressure at high elevation and therefore restore a lower-friction fork. Generally, it is important to seal a fork to prevent the lower leg oil bath lubrication from leaking out of the fork. In one embodiment, the air bleed assembly **300** (of FIG. **4**) is located right below the lower leg seal **135** so that when excessive air pressure in the fork is relieved at high elevation, the oil bath **140** typically leveled in the lower leg (typically 20-50 cc) does not spray/leak out. In other words, a substantial portion (most of the oil bath **140**), if not all, of the oil bath **140** remains within the lower leg (and does not spray/leak out

2

of the lower leg) when the air bleed assembly **300** is opened to release excessive air pressure from the fork.

FIG. **3** shows the air bleed assembly **300** including button **150** positioned on a die-cast feature of the lower leg. Pressing the button **150** equalizes the air pressure in the fork/shock assembly with the local ambient air pressure.

FIG. **2** shows a cross-section of the air bleed assembly **300** and the vent hole **154** between the seal (not shown) and the upper bushing **120** (or behind foam ring **125**). When the button **150** is pressed, the sealing o-ring **151** moves into the diametrical recess **152** and thereby becomes unsealed, letting the air pressure by-pass into or out of the fork leg via vent hole **154** to equalize the pressure in the fork leg with an exterior pressure. When the button **150** is released, a spring **153**, which biases the button/valve **150** toward a closed position, urges the o-ring **151** into a sealing engagement with a seal bore **155**.

FIG. **4** shows positioning of the air bleed assembly **300** relative to the "oil bath" lubrication in the lower leg/shock tube.

(*Id*. at 3:65–4:30).

Claim 1, the sole independent claim, states:

1. A lower fork and air bleed assembly combination comprising:

a lower fork, said lower fork configured to have a first end coupled to a vehicle wheel, and a second end configured to be telescopically engaged with a first end of an upper fork, said lower fork further comprising:

a lower leg seal located at an outermost edge of said second end of said lower fork tube, said lower leg seal configured for sealing closed a gap disposed between said upper fork tube and said lower fork tube when said lower fork is telescopically engaged with said first end of said upper fork, thereby preventing an oil bath lubrication occupying an area within said lower fork tube at a first end of said lower fork tube from leaking from said lower fork; and

an upper bushing attached to and positioned adjacent to said lower leg seal; and

> an air bleed assembly disposed on said lower fork tube, said air bleed assembly configured for equalizing ambient pressure within said lower fork, said air bleed assembly comprising:
>
> a fluid passage disposed between an interior of said lower fork and an exterior of said lower fork; and
>
> a manually operable valve located in said lower fork and coupled to said fluid passage, said manually operable valve having a first position substantially closing said fluid passage and a second position allowing a fluid to flow between said interior and said exterior, said manually operable valve disposed between said lower leg seal and said first end of said lower fork, and wherein said fluid passage and said manually operable valve are located at a distance from an oil bath lubrication within said lower fork, such that when said manually operable valve is in said second position, most, if not all of said oil bath lubrication remains within said lower fork and such that when trapped air pressure inside said lower fork, that is higher than a local ambient air pressure outside of said suspension fork or shock absorber, is relieved most, of said oil bath lubrication that is within said lower fork remains within said lower fork.

(*Id.* at 4:39–5:13).

Senior District Judge Raymond P. Moore was previously assigned to this case and held a claim construction hearing on December 7, 2023 (D. 135). After the case emerged from as stay related to proceedings before the U.S. Patent and Trademark Office involving a patent that is no longer asserted in this action, the case was reassigned to the Undersigned (D. 226).

## II. LEGAL STANDARD

Claim construction is a question of law with underlying questions of fact. *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1278 (Fed. Cir. 2017). "Claim construction requires determining how a skilled artisan would understand a claim term 'in the context of the entire patent, including the specification.'" *Grace Instrument Indus., LLC v. Chandler Instruments Co.*, 57 F.4th 1001, 1008 (Fed. Cir. 2023) (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313

4

(Fed. Cir. 2005) (en banc)).  Claim terms are generally accorded their plain and ordinary meaning to a person of ordinary skill in the art in the context of the patent. *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1094 (Fed. Cir. 2013).  The patent "specification 'is always highly relevant to the claim construction analysis,'" and "'the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  The Supreme Court has made clear that there are cases where the district court must "look beyond the patent's intrinsic evidence and . . . consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015).  But "[o]nly if a disputed claim term remains ambiguous after analysis of the intrinsic evidence should the court rely on extrinsic evidence." *Pickholtz v. Rainbow Techs., Inc.*, 284 F.3d 1365, 1372–73 (Fed. Cir. 2002) (citing *Vitronics*, 90 F.3d at 1583).

### III. ANALYSIS

#### A. "an air bleed assembly disposed"

| Fox Factory Proposal | SRAM Proposal |
|---|---|
| "air bleed assembly is disposed anywhere on the lower fork between the lower leg seal and a resting level of the oil bath in the lower fork" | "air bleed assembly located between the lower leg seal and the upper bushing" |

SRAM asserts that statements made during the prosecution of the '331 patent should limit the location of the air bleed assembly.  The relevant prosecution history involves rejections over U.S. Patent Pub. No. 2012/0080279 (Galasso).  Galasso is a suspension product with a bleed valve.

In the rejection, the patent examiner stated in relevant part:

> Claim 1: Galasso discloses an air bleed system assembly [see Figs. 2-4] comprising: a lower fork (210), said lower fork configured to

5

> have a first end coupled to a vehicle wheel, and a second end telescopically engaged with a first end of an upper fork (220); a fluid passage (224, 424-2) disposed between an interior (inside 210) of said lower fork and an exterior (outside 210) of said lower fork; and a manually operable valve (214, 314, 414, 470) [see para. 0037 (either a "rotary sleeve" and/or a "bleed valve" such as a Schrader-type valve)] located in said lower fork [note: Julia reference, discussed infra, explains that "lower" is a relative term], said manually operable valve having a first position substantially closing said fluid passage [see, e.g., Fig. 2 (when 236 covers 224)] and a second position allowing a fluid to flow between said interior and said exterior [see, e.g., Fig. 2 (when 214 is screwed upward such that 224 is open)]. See Figs. 2-4.

(D. 124-4 at 180–81).

Fox Factory amended Claim 1 to add the paragraph where the term appears. If full, the paragraph states:

> an air bleed assembly disposed on said lower fork tube, said air bleed assembly configured for equalizing ambient pressure within said lower fork, said air bleed assembly comprising:

(D. 124-4 at 220).

Based in part of the amendment, Fox Factory responded to the rejection in relevant part:

> <u>In contrast</u> to Galasso, Applicant's features, as recited in newly amended Claim 1, locate its air bleed system <u>in a lower fork</u>, wherein the vent hole is located between the lower leg seal and the bushing that is attached thereto. The manually operable valve is also positioned <u>between the lower leg seal and the first end of said lower fork (first end is configured to be coupled to a vehicle wheel).</u> Thus, the air bleed system, including the manually operable valve, is located <u>below the lower leg seal</u> that is attached to the outmost edge of a second end of the lower fork tube, wherein the second end of the lower fork is configured to receive an upper fork telescopically therein.
>
> * * *
>
> This pressure and load added to the lower oil control lip of the seal, sealing the gap between the lower fork tube and a telescopically

> positioned upper fork tube, serves to compromise the seal, and possibly enable the oil lubrication within the lower fork tube to leak/spray out of the damper assembly. However, due to the positioning of Applicant's air bleed system being located directly below the lower leg seal, within the lower fork tube, wherein the lower fork tube is positioned further away from the frame of the vehicle than the upper fork tube, Applicant's features enable the release of excessive air pressure from the lower fork tube, thereby reducing the pressure and load being applied to the lower oil control lip of the lower leg seal, while enabling the oil bath lubrication to remain fairly leveled at the bottom of the lower fork tube, without spraying/leaking out through the open vent hole. Applicant's features allow for the pressure in the lower leg to be equalized to ambient pressure at the higher elevation, and therefore restore the desired friction in the lower fork tube in relation to the upper fork tube. Thus, in sum, the air bleed assembly 300 is located below Applicant's lower leg seal, and far enough away from the oil bath lubrication such that a substantial portion of the oil bath lubrication is enabled to remain within the lower fork tube even when air is being released from the lower fork tube through the vent hole of the air bleed assembly 300.
>
> * * *
>
> Galasso, on the other hand, includes a SAG setting bleed port 224 that is positioned above a seal between the gas cylinder 210 and the damping fluid cylinder 220. Galasso functions to allow air to be released from a cylinder that is not a cylinder that contains an oil bath lubrication. If Applicant's air bleed system were positioned above the seal that lies between the lower fork tube and the upper fork tube, then when the air bleed system is opened to allow for the escape of excessive air pressure from the damper, the pressure that is being applied on the lower oil control lip of the lower leg seal would not be reduced, as the pressure that is being applied is from the direction of the lower fork tube and not the upper fork tube.

The Fox Factory and the patent examiner thereafter engaged in an interview where "[n]o agreement was reached" (D. 124-4 at 226). However, shortly thereafter, the examiner allowed all pending claims without further explanation (*id*. at 235).

SRAM argues that Fox Factory's statements discussing the location of the vent hole ("between the lower leg seal and the bushing that is attached thereto") and the air bleed system ("directly below the lower leg seal") constitute disclaimer defining the location where the claimed air bleed assembly must be disposed (D. 124 at 4–7).  It also notes that, in the sole disclosed embodiment, the air bleed assembly is located between the lower leg seal and upper bushing (id. at 5).

Fox Factory counters that the isolated statements identified by SRAM do not create clear and obvious disclaimer because it refers to an unclaimed element (the vent hole) and repeatedly refers to the actual claim language in discussing the location of the air bleed assembly (D. 125 at 3–6).  For example, Fox Factory stated that, "in sum, the air bleed assembly 300 is located below Applicant's lower leg seal, and far enough away from the oil bath lubrication."  It further argues that no such disclaimer was required for allowance because the system of Galasso is so different, lacking an oil bath and having its air bleed assembly above the seal (*id*. at 5).  It notes that the Federal Circuit has rejected the proposition that claims should be limited to the unclaimed features disclosed embodiments, even where there is only one disclosed embodiment.

To invoke the doctrine of prosecution disclaimer, the statements made must be "both clear and unmistakable." *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360 (Fed. Cir. 2017).

The Court agrees with Fox Factory that its statements do not constitute clear and unmistakable disclaimer that should be read into the claims to limit the location of claimed air bleed assembly.  When read in context, Fox Factory's statements distinguishing Galasso relate to the overall design challenges met by placing the air bleed assembly below the lower leg seal and far enough above the oil bath to prevent the oil from leaking out then pressure is equalized.  Fox

8

Factory's statements indicate that it believed solving this design challenge, not present in Galasso which lacks an oil bath, was sufficient for patentability. Nothing in the record persuasively suggests that limitation to the specific location depicted in the sole embodiment was necessary for patentability. Such statements would not have been understood by the examiner or another skilled in the art to clearly require that air bleed assembly be located more specifically than as claimed, namely, "disposed on said lower fork tube" and, in combination with its claimed component manually operable valve, "located at a distance from an oil bath lubrication within said lower fork, such that when said manually operable valve is in said second position, most, if not all of said oil bath lubrication remains within said lower fork."

Additionally, the statements themselves do not appear unequivocally limiting to the claims. Although a vent hole can be a feature related to an air bleed assembly as taught by the '331 Patent, no vent hole is required by Claim 1. Thus, even a statement that one part of the assembly is in one position would not be read to limit the position of the claimed air bleed assembly, particularly where the claim language does not require a vent hole. *See Maquet Cardiovascular LLC v. Abiomed Inc.,* 131 F.4th 1330, 1345 (Fed. Cir. 2025) (finding the "prosecution history of the '728 patent is not relevant, as it does not address a limitation in common with the patent in suit") (cleaned up). Likewise, the statement that the air bleed system is "directly below the lower leg seal" does not narrowly limit its location in context as SRAM suggests. Even in the sole embodiment, there is an intervening foam ring before the air bleed assembly and it is located a substantial distance above the oil bath, allowing significant area that the air bleed assembly could be considered "directly below" the lower leg seal without defeating a purpose of the invention to keep the oil bath contained. *See MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377,

9

1380–81 (Fed. Cir. 2012) (explaining that the scope of the claims must align with the scope of the enablement).

The Court must, however, reject Fox Factory's construction which is confusing and appears to conflict with other language of the claim. In particular, it is not clear that allowing the air bleed assembly to be located "anywhere" above "a resting level of the oil bath" is consistent with the claim limitation requiring its component manually operable valve to be "located at *a distance from* an oil bath lubrication within said lower fork." The claimed language, requiring "an air bleed assembly disposed on said lower fork tube" is sufficiently clear for understanding by the jury, is consistent with how one skilled in the art would read the term, and the Court has resolved the parties dispute about whether air bleed assembly must be located more specifically than as claimed. Accordingly, the Court declines to construe the term further. *See Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1290-91 (Fed. Cir. 2015) (no need to construe claim term with clear plain meaning); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012) (rejection of restrictive construction resolved dispute).

B. "manually operable"

| Fox Factory Proposal | SRAM Proposal |
|---|---|
| "able to be used by hand with or without tools" | "able to be used by hand without tools" |

The Parties dispute whether "manually operable" includes operation requiring tools. Fox Factory notes that the '331 Patent does not limit the operation to by hand without tools (D. 123 at 13–14). SRAM argues that the limitation is included within the patents and patent publications included by reference in their entirety (D. 124 at 9–10). It quotes only one such example, which is not at all persuasive. SRAM quotes U.S. Pat. No. 6,581,948 at 26:49–51, which states "an

10

adjustment knob may be connected to the needle 215 to allow a user to easily rotate the needle without the use of tools." This, of course, does not use the word "manually" much less purport to define that term. Further, the immediately preceding sentence, which SRAM omits from its brief, indicates that use of tools is permissible, i.e., the "exposed end of the needle 215 may alternatively include other suitable arrangements that permit the needle 215 to be rotated by a suitable tool, or by hand" (*id*. at 26:46–48). Thus, in context, the adjustment knob is a tool for rotating the needle.[1] As such, contrary to SRAM's arguments, text incorporated into the '331 Patent suggests that tools, such as attached knobs, are permissible within the scope of the claimed invention when using features of the invention that are otherwise operable by hand. This also comports with common sense understandings and ordinary usage of manually operable valves, which can be opened with a hand-operated lever or knob, e.g., in a faucet (*see* D. 123-1 at 12 ("manual operation requires human work, with hands or with tools, while automatic operation does not require human work to complete the tasks (after the process has been automated)"). Accordingly, the Court adopts Fox Factory's proposed construction "able to be used by hand with or without tools" as how a person of ordinary skill in the art would understand the term "manually operable" in Claim 1 at the time of the invention.

### C. "an upper bushing attached to and positioned adjacent to said lower leg seal"

| Fox Factory Proposal | SRAM Proposal |
|---|---|
| "an upper bushing and the lower leg seal are in contact with and next to each other" | "an upper bushing affixed to and positioned next to the lower leg seal" |

---

[1] SRAM's experts discuss nineteen additional examples that are, if possible, even less persuasive (D. 124-1 at 26–27; D. 124-2 at 25–26).

Despite the lengthy phrase for construction, the only substantive dispute between the parties is over the meaning of "attached" (D. 123 at 8) (no "dispute that 'adjacent to' means 'next to'") (D. 124 at 8) ("the only actual dispute is whether 'attached' has its plain meaning of 'affixed'"). At the most basic level, the ordinary meaning of "attached," when used in the physical sense as here,[2] is something more than "in contact with" as Fox Factory proposes. My keyboard is "in contact with" my desk, but it is not "attached" in any common meaning of that term. But, of course, this does not end the inquiry because patentees can be their own lexicographers and what ultimately matters is how a person of skill in the art would have understood the term at the time of the invention in the context of the patent and its file history. *See Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004) ("Even when guidance is not provided in explicit definitional format, the specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents.") (citations omitted).

Fox Factory argues that the '331 Patent nowhere "disclose[s] or require[s] that the bushing and seal be affixed" (D. 123 at 9). It states that "Figure 4 shows that the bushing 120 is simply in contact with foam ring 125 (which is part of the lower leg seal because it minimizes or prevents leakage of oil through the gap between the upper and lower fork tubes)" (*id*.). This argument is of little persuasive value because, without some indication either way, objects next to either other could simply be in contact with or affixed to one another. The image is, at best, ambiguous. Indeed, almost all of the elements shown in contact in Figure 4 are also affixed to one another, for

---

[2] In contrast to, for example, emotionally attached.

example, the bushings are attached to the fork tube, the seals are attached to the lower fork tube, and the air bleed assembly is attached to (or integrated into)[3] the lower fork tube.

Perhaps aware of this issue, Fox Factory has somewhat taken a middle ground in its briefing and argument at the claim construction hearing, by noting that the form of contact holds the relative pieces in place. For example, it argues that, "[b]y being in contact with the bushing, the foam ring (a portion of the seal) is supported and held in place by the bushing and prevented from being displaced during the telescoping movement between the upper and the lower fork tubes" (*id*.) (citing D. 123-1 at 11) (*see also* D. 124 at 9) (challenging this interpretation as a "new proffer"). This argument has some appeal when applied, as it has been by Fox Factory, to the lower leg seal, which is a sort of glorified rubber band gasket held in tension around the upper fork to prevent leakage (*see* D. 123-1 at 11–12). A rubber band tightly wrapped around something might be said to be attached to it. But this is not the circumstance at issue in the claim term for construction. The lower leg seal (including or not the foam ring) is not wrapped around the upper bushing (*see* '331 Patent at Fig. 4 and Claim 1) like a rubber band. Instead, it surrounds and applies tension to the upper fork (*see id*. at Figure 1 and at 3:36–39). The lower leg seal is simply disclosed as, at least by way of the foam ring,[4] adjacent to and perhaps attached to the upper bushing.

Fox Factory supports its position here with expert testimony that a "skilled artisan would also understand that a fork's operation would be degraded if the seal and bushing were affixed together" (D. 123 at 9). He explains that:

---

[3] For example, Claim 5 requires that "said valve activator is located on a die-cast feature of said lower fork" ('331 Patent at 6:2–3).

[4] SRAM disputes that the foam ring can be regarded as part of the lower leg seal, but it did not raise a claim construction to that effect (see D. 120; D. 124 at 9 n.5).

13

> Moreover, the bushing must support side loads on the forks, provide little resistance to axial sliding motion, and be wear-resistant. Therefore, the bushing is typically made of a hard slippery plastic, such as a high-density polyethylene often compounded with PTFE, or be an inherently lubricious plastic such as an acetal polymer (e.g., Delrin). The seal, on the other hand, must include a resilient polymer such as a Buna rubber, and often also includes a foam element in series with the resilient member to help confine oil to one side of the resilient element, and yet keep it and any nearby bushings lubricated. One skilled in the art would understand that the bushing and the seal are separate materials and components, and that in order to properly seal the gap between the telescoping forks, the seal material(s) must be free to expand and contract and it cannot be affixed or bonded to the bushing, otherwise the seal will not be able to perform its sealing function. Moreover, as the seal is wet with oil, it makes no sense to suggest it be affixed or bonded to the bushing. One well-known way to build a telescoping fork would be to include a lower leg seal in contact with the bushing, with the seal's nominal position constrained by and with respect to the bushing, such as by press fitting the seal into the fork and against the bushing. With the seal in contact with the bushing in this manner, the seal material(s) can expand or contract as needed to accommodate manufacturing tolerances, temperature changes, or changes in shape caused by loadings that occur during aggressive riding. This design is shown in Figure 4 of the '331 patent, and one of ordinary skill in the art would understand the lower leg seal and bushing are attached to each other in this design. Indeed, anyone who has ever repaired a fork would know that the bushing and the seal are separable elements, and are not affixed to each other. Furthermore, if they somehow could be affixed to each other, the function of the seal would be adversely affected, as discussed above.

(D. 123-1 at 11–12). This testimony is not challenged in SRAM's brief (D. 124 at 7–9), but it is only persuasive to a point. It shows that attaching the components together would likely be a bad design. But it does not imply that a person of skill in the art would think such a design unworkable or that the inclination against attaching such components together would be enough for them to overcome the common meaning of "attached" when reading Claim 1, which neither Fox Factory nor its expert suggest has a special meaning in the relevant art. *See Phillips*, 415 F.3d at 1317

(explaining that extrinsic evidence, such as dictionary definitions and expert testimony, is less significant than and cannot be used to contradict intrinsic evidence).

Ultimately, the context around the word "attached" in Claim 1 dooms Fox Factory's interpretation.  The claim already requires that the lower leg seal is "adjacent to" the upper bushing.  This language would be redundant of "in contact with."  "Adjacent" is a broader term than "in contact with" because physically adjacent encompasses situations such as people seated adjacent that are not in contact.  *Cf. Weber, Inc. v. Provisur Techs., Inc.*, 92 F.4th 1059, 1070 (Fed. Cir.), *cert. denied sub nom. Provisur Techs., Inc. v. Weber, Inc*, 145 S. Ct. 173 (2024) ("The claim term's recitation of broad language 'compels a similarly broad result.'" (quoting *Malvern Panalytical Inc. v. TA Instruments-Waters LLC*, 85 F.4th 1365, 1372 (Fed. Cir. 2023))).  But everything that is "in contact with" something, in the physical meaning of that term as used here,[5] is also adjacent to it.  Indeed, when "attached" is read as "in contact with" the subsequent phrase "adjacent to" (or, as construe by the Parties, "next to") adds no meaning.  Fox Factory's proposed construction is akin to 'an upper bushing and the lower leg seal are right next to and next to each other.'  The language of the claims themselves is the surest guide to the correct interpretation of claims.  *Actelion Pharms. LTD v. Mylan Pharms. Inc.*, 85 F.4th 1167, 1171 (Fed. Cir. 2023) ("We start with the claim language.") (citation omitted).  Here, the use of both "attached to" and "adjacent to" in reference to the same component elements necessarily suggests that the terms mean something different than one another and place separate restrictions on the relationship between those two elements.  *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012) ("The fact that the two adjacent claims use different terms in parallel settings supports the district

---

[5] The is, in contrast to the communication meaning where someone is, for example, in contact by email.

court's conclusion that the two terms were not meant to have the same meaning "); *Actelion Pharms.*, 85 F.4th at 1171 ("a claim construction giving meaning to all terms in a claim is preferrable over one that does not"). Nothing in the patent suggests differently because it does not disclose whether the components are attached in the sole disclosed embodiment. Accordingly, any person of skill in the art would not read "attached" merely read "in contact with." *Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1371 (Fed. Cir. 2008) (""Different claim terms are presumed to have different meanings."). Instead, a person of skill in the art would understand "attached" in this context to have its common meaning of "affixed" as proposed by SRAM, regardless of whether they would be skeptical that doing so would be the best possible design. Therefore, the Court adopts SRAM's interpretation of the term "an upper bushing attached to and positioned adjacent to said lower leg seal" as "an upper bushing affixed to and positioned next to the lower leg seal."

So ORDERED.

DATED August 11, 2025.

BY THE COURT:

Gordon P. Gallagher
United States District Judge

16